1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   UNITED STATES OF AMERICA,              CASE NO. 10CR312 WQH

12                          Plaintiff,      ORDER
                vs.
13   PEDRO FERNANDEZ-FLORES(1), aka
     Angel Mendez-Sierra, and SAUL TOGA-
14   GOMEZ(2),

15                          Defendants.

16

17   HAYES, Judge:

18          The matters before the Court are: 1) the motion to dismiss the indictment on the grounds

19   that the Government released material witnesses with exculpatory evidence (Doc. # 23) filed

20   by Defendant Toga-Gomez and 2) the motion to suppress all evidence resulting from unlawful

21   investigatory stop and suppress suggestive identification (Doc. #34) filed by Defendant

22   Mendez-Sierra.

23                                    **FACTS**

24          On Monday January 25, 2010, Border Patrol Agents Sean Dillon and Richard

25   Hernandez were assigned to the El Centro Border Patrol Station and conducting field

26   intelligence operations.  Agents from the El Centro Border Patrol Station had received

27   information earlier in the day to be on the look out for a white van bearing Illinois license plate

28   71317T. The notice to be on the look out was generated by Special Agent Ryan Beckhelm of

Immigration and Customs Enforcement.  Special Agent Beckhelm, assigned to the human smuggling and human trafficking group, was conducting an investigation involving Gilbert Gutierrez.  Agent Beckhelm knew that Gutierrez had crossed the international border in a white panel van 15 to 20 times.  After each crossing, Gutierrez parked the van next to the Port of Entry, and walked south into Mexico through the pedestrian lane.

On January 16, 2010, Agent Beckhelm was notified that Gutierrez had crossed at the Port of Entry in a white panel van.  Agent Beckhelm initiated surveillance on the van. Gutierrez parked the van in a parking lot and walked south into Mexico.  Agent Beckhelm identified the white panel van in the parking lot as bearing Illinois license plate 71317T and placed a tracking device on the van.  Based upon his investigation, Agent Beckhelm initiated an alert for Gutierrez and for the white panel van bearing Illinois license plate 71317T.

On January 24, 2010, Agent Beckhelm was notified by agents of Customs and Border Patrol that the same white van with the same license plate had crossed from Mexico into the United States and that Gutierrez was the driver of the van.  Agent Beckhelm instructed border patrol agents to release the van and Gutierrez north.  Agent Beckhelm initiated the tracker on the van.  Agents at the El Centro Border Patrol Station were notified early in the day on January 25, 2010 to be on the lookout for the white panel van bearing Illinois license plate 71317T.  Agent Hernandez and Agent Dillon saw the alert when they came to work the swing shift on January 25, 2010.

At approximately 8:15 p.m., Agent Dillon received a call from Agent Beckhelm notifying him that the van had been tracked from San Diego to an apartment complex in El Centro and that the van was moving again.  Agent Beckhelm told Agent Dillon that the van was traveling westbound on Interstate 8 and asked Agent Dillon if he could attempt to follow the van.

At approximately 8:30 p.m., Agent Dillon observed a large white van traveling westbound on Interstate 8.  Agent Dillon contacted his partner Agent Hernandez for assistance in confirming the license plate of the van.  As Agent Dillon contacted Agent Hernandez, the van exited Interstate 8 and began traveling north on Forrester Road.  Agent Hernandez

1   observed the van merge north through the intersection of Forrester Road and Highway Old 80.

2   The van continued northbound on Forrester until the van reached Worthington Road, where

3   it began traveling west.  Agent Hernandez continued mobile surveillance at a distance and was

4   able to verify that the van was bearing Illinois license plate 71317T.

5         Agent Dillon and Agent Hernandez continued mobile surveillance at a distance in order

6   to avoid detection.  The van continued to travel westbound and turned onto New River  Road.

7   Agent Dillon made a U-turn and came back by the van while he was traveling east on New

8   River.  At this point, Agent Hernandez  observed the van stop at an access dirt road on New

9   River Road south of Worthington Road and turn off its lights.  The New River Road area is

10  known to the agents as an area where illegal aliens using river access into the United States

11  load into vehicles.  Agent Hernandez proceeded eastbound on New River Road.

12        Agent Dillon resumed surveillance on the van going west on Worthington Road.   The

13  van appeared to the Agent Dillon to be heavily laden in the rear at this point.  The van ended

14  up on Forrester Road and Agent Hernandez took over primary surveillance.  Agent Hernandez

15  continued at a distance and observed the van making random U-turns in an apparent effort to

16  veer off an agent who may be following.  Agent Hernandez drove past the van a second time

17  stopped on Kruger Road and observed "10 plus" people exiting the van.  Agent Hernandez was

18  not prepared to stop the van at that point and drove on.  Shortly after, Agent Hernandez parked

19  facing eastbound on Bannister Road.  Agent Hernandez called Agent Dillon and the agents set

20  up with the intention to stop the van.

21        At approximately 9:10 p.m., the agents requested assistance from El Centro Sector Air

22  Operation (Air Support).  Air support arrived at approximately 9:20 p.m.  As Agent Dillon and

23  Agent Hernandez approached the van, the van had started moving again northbound on Kruger

24  Road.  At the point that the agents were approximately 200 yards from the van, the van stopped

25  abruptly and a large number of individuals exited from the van running in different directions.

26   With assistance of air support, Agents Dillon and Hernandez were able to locate twenty-eight

27  individuals who were determined to be citizens of Mexico with no immigration documents.

28  All twenty-eight individuals were transported to the Border Patrol station in El Centro.

Agent Beckhelm arrived at the El Centro Border Patrol Station with his team to process the individuals apprehended.  Agent Beckhelm conducted a pre-screening interview with all twenty-eight individuals.  During the interview, Agent Beckhelm drew a number on the back of the hand of each of the individuals apprehended around the van and took each individual's photograph.  During the screening interview, Agent Beckhelm asked each individual if he could identify the guides and/or the driver.  Three individuals in the pre-screening interview indicated that they could identify the driver and two of the same three individuals stated that they could identify the guide. Agent Beckhelm made the decision to retain these three individuals as material witnesses.

Agent Beckhelm conducted a recorded interview with each of the three retained material witnesses separately.  During the interview, Agent Beckhelm asked again if the witness could identify the guides and/or driver and the witness indicated that he could.  Agent Beckhelm showed each of the three witnesses the twenty-eight photos taken of each of the individuals apprehended.  Three of the witnesses identified Defendant Mendez-Sierra as the driver of the van and two of those three witnesses identified Defendant Toga-Gomez as a foot-guide.  Defendants were arrested and twenty-three individuals were returned voluntarily to Mexico.  Each of the twenty-three aliens returned voluntarily to Mexico stated in the pre-screening interview that they were not able to identify the driver of the van or the guide.

## ANALYSIS

Motion #23 to dismiss the indictment on the grounds that the Government released material witnesses with exculpatory evidence filed by Defendant Toga Gomez

Defendant moves the Court to dismiss the indictment on the grounds that the government violated his right to due process under the Fifth Amendment when it administratively removed the twenty-three material witnesses. Defendant contends that the Government has prevented him from presenting his defense that he did not act as a guide but rather was one of the undocumented persons being smuggled.  Defendant asserts that the evidence that the twenty-three deported material witnesses could not identify the guide or the driver was material and favorable such that the Court should dismiss the charges against him.

1    The Government contends that the Defendant has failed to show that the Government
2    acted in bad faith and that the Defendant has not made the required showing of prejudice to
3    support a constitutional violation. The Government asserts that none of the aliens returned to
4    Mexico gave a statement inconsistent with the statements of the three material witnesses
5    retained and that the decision to remove them was made in order to comply with standard
6    border patrol policy. The Government asserts that Agent Beckhelm will testify that the
7    twenty-three deported witnesses could not identify the Defendant as the guide.

8    The right to retain a deportable alien witness is based upon the Fifth Amendment
9    guarantee of due process of law and the Sixth Amendment guarantee of compulsory process
10   for obtaining witnesses in one's favor. *See United States v. Medina-Villa*, 567 F.3d 507, 516
11   (9th Cir. 2009). In *United States v. Dring*, 930 F.2d 687, 693 (9th Cir. 1991), the Court of
12   Appeals explained:

13   > In cases of constitutionally guaranteed access to evidence, wherein the
     > Government loses potentially exculpatory evidence, the Supreme Court applies
14   > a two-pronged test of bad faith and prejudice....Under this two-pronged test, the
     > defendant must make an initial showing that the Government acted in bad faith
15   > *and* that this conduct resulted in prejudice to the defendant's case. To prevail
     > under the prejudice prong, the defendant must at least make 'a plausible showing
16   > that the testimony of the deported witnesses would have been material and
     > favorable to his defense, in ways not merely cumulative to the testimony of
17   > available witnesses.' *Valenzuela*, 458 U.S. at 873, 102 S.Ct. at 3449.

18   *Id.* at 693-694. In this case, the government interviewed the twenty-three material witnesses
19   and made the determination that they were not able to identify the guide or the driver.
20   Government agents deported the material witnesses pursuant to border patrol policy and
21   immigration policy.

22   In *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), the United States Supreme
23   Court stated:

24   > To summarize, the responsibility of the Executive Branch faithfully to execute
     > the immigration policy adopted by Congress justifies the prompt deportation of
25   > illegal-alien witnesses upon the Executive's good-faith determination that they
     > possess no evidence favorable to the defendant in a criminal prosecution. The
26   > mere fact that the Government deports such witnesses is not sufficient to
     > establish a violation of the Compulsory Process Clause of the Sixth Amendment
27   > or the Due Process Clause of the Fifth Amendment. A violation of these
     > provisions requires some showing that the evidence lost would be both material
28   > and favorable to the defense.

1    *Id.* at 872- 873.  "[P]rompt deportation of witnesses who are determined by the Government

2    to possess no material evidence relevant to a criminal trial," ... "satisf[ies] immigration policy,"

3    and mitigates the "substantial financial and physical burdens upon the Government, not to

4    mention the human costs to potential witnesses who are incarcerated though charged with no

5    crime."  *Medina-Villa*, 567 F.3d at 517 quoting *Valenzuela-Bernal*, 458 U.S. at 865.

6    "[S]anctions will be warranted for deportation of alien witnesses only if there is a reasonable

7    likelihood that the testimony could have affected the judgment of the trier of fact."  567 F.3d

8    at 517 *quoting Valenzuela-Bernal*, 458 U.S. at 874.

9         In this case, the fact that the twenty-three deported material witnesses could not identify

10   the guide or the driver is not disputed by the Government and Agent Beckhelm is available to

11   testify that the deported material witnesses stated that they could not identify the guide or the

12   driver.  Defendant will not be deprived of this evidence at trial.  The Court finds that the

13   Defendant has not made a sufficient showing that the deported material witnesses possessed

14   evidence material and favorable to the Defendant such that the Government was required to

15   retain the twenty-three material witnesses or face the sanction of dismissal.   The prompt

16   deportation of the material witnesses in this case did not violate the Defendant's constitutional

17   rights and fulfilled "the responsibility of the Executive Branch faithfully to execute the

18   immigration policy adopted by Congress."  *Id.* at 872.  The Defendant has not made a showing

19   that the Government acted in bad faith or that the deportation of the twenty-three material

20   witnesses resulted in prejudice to his case.  Defendant's motion to dismiss the indictment on

21   the grounds that the Government released material witnesses with exculpatory evidence is

22   denied.

23   Motion #34-1 to suppress all evidence resulting from unlawful investigatory stop filed by

24   Defendant Mendez-Sierra

25        Defendant contends that the border patrol agents lacked reasonable suspicion to stop

26   the van.  The Government asserts that the agents had reasonable suspicion to stop the van but

27   that the van, in fact, stopped abruptly of its own accord prior to the agents' execution of a stop.

28   Viewing the totality of the circumstances, the government asserts that the officers had a

particularized and objective basis for suspecting the Defendants to be involved in alien smuggling.

In *United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007), the Court of Appeals for the Ninth Circuit explained that "[i]n determining whether a stop was justified by a reasonable suspicion, we consider whether, in light of the totality of the circumstances, the officer had 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'... In the context of border patrol stops, the totality of the circumstances may include '(1)characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and the time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver including obvious attempts to evade officers; (6) appearance or behavior of the passengers; (7) model and appearance of the vehicle; and (8) officer experience.'" *Id.* (citations omitted)

In this case, Agent Dillon and Agent Hernandez received an alert to be on the look out for this specific vehicle suspected for use in alien smuggling. The vehicle was identified by specific description and license plate number. Agent Beckhelm identified the vehicle while conducting a human smuggling investigation of a specific target. Agent Beckhelm had placed a tracking device on the van and alerted the agents that the van was in their vicinity. Agent Dillon had received specific information from Agent Beckhelm that there was a tracker on the van, that agents had followed the van from San Diego to El Centro, and that the van was headed west on Interstate 8. Agent Dillon and Agent Hernandez identified the van as the specific vehicle suspected for use in alien smuggling in the area. The agents observed the van pull off the road in an area known to the agents be used by illegal aliens using river access to load into vehicles. The van turned off its headlights for a short period of time and started back up. Agent Hernandez observed the van engage in counter measures to avoid detection and Agent Dillon made the observation that the van looked like it was heavily load in the rear. Agent Hernandez observed the van stopped a second time and observed "10 plus" people exiting the van. At this point, the agents had a particularized and objective basis for suspecting that the persons in the van were engaged in criminal activity. The agents called for air

surveillance but before the agents could execute the stop the van abruptly stopped and large number of individuals exited the vehicle from the van running in different directions.  The Court concludes that the agents had reasonable suspicion to stop the van and that there was reasonable suspicion to stop the individuals running from the van.  Defendant's motion to suppress evidence (#34-1) is denied.

Motion #34-2 to suppress suggestive identification of Defendant Mendez-Sierra

Defendant contends that the photo identification process used by Agent Beckhelm was overly suggestive.  Defendant asserts that he stands out because "his is the only picture where instead of a raised fist he has a raised fist with his middle finger protruding, in what looks like an obscene gesture, 'throwing a finger.'"  Doc. # 34-1 at 13.  Defendant asserts that this photo would pre-dispose the material witnesses to choose his photo.  Defendant further asserts that the presentation of the photo line-up was conducted so as to indicate or predispose the identifying party to pick out the accused because the three material witnesses were told that the driver and/or guides were in the stack of photographs they were shown.

The Government asserts that the identification was not unduly suggestive, that a number of the suspects have raised fists, and that the Defendant's hand position is not noticeably different from others or suggestive that he is the driver of the load vehicle.  The Government further asserts that the interviewing agent made no effort to suggest one photograph over others and no statements impermissibly suggestive.

The Due Process Clause of the Fourteenth Amendment provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." U.S. Const. Amend. XIV. "Suggestive pretrial identification procedures may be so impermissibly suggestive as to taint subsequent in-court identifications and thereby deny a defendant due process of law." *United States v. Bagley*, 722 F.2d 482, 492 (9th Cir. 1985).  "Suggestive confrontations are disapproved because they increase the likelihood of misidentification...." *Neil v. Biggers*, 409 U.S. 188, 198 (1972).  "[E]ach case must be considered on its own facts, and []convictions based on eye witness identification at trial following a pretrial identification by photograph will be set aside [] only if the photographic identification procedure was so impermissibly

suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Id.* at 196-197 quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968).

In this case, the Agent Beckhelm conducted screening interviews with each of the twenty-eight individuals apprehended at the scene. During the screening interview, the agent drew a number on the back of the hand of each individual and took a photograph of each individual with his hand raised and the number visible. The agent asked each individual if they could identify the driver and/or the guides. The three material witnesses who were retained indicated in the screening interview that they could identify the driver and/or the guide.

Agent Beckhelm then conducted a recorded interview with the three material witnesses. The agent conducting the interview confirmed that the material witnesses could identify individuals guiding the group. Each of the material witnesses indicated that there were three to four individuals guiding the group. The agent then informed the material witness that he was going to show the material witness twenty-eight photos of all of the people arrested and asked the material witness to identify the individuals guiding the group if they were in the photos. Doc. # 35, Defendant's Supplemental Exhibits, Exhibit C at 13 ("I'm going to give you a package of photos and you look at all the photos one by one, and separate out the persons that are familiar to you."); Exhibit D at 31 ("Could you identify one or two of those four or possible the four persons if they are in those pictures?"); and Exhibit E at 56 ("Look at all the photos and separate the ones you know that were the guides, and the - or the one who was driving the car if they are there.").

The Court concludes that the identification process in this case was not overly suggestive. The agents made no statements which would indicate one photo over another or indicate that the material witnesses were required to identify any photo. In this case, the twenty-eight photos were taken and presented in a similar manner, the material witnesses had indicated in the screening interview and the recorded interview prior to viewing any photos that they were able to identify the guides or the driver, and there was no efforts to suggest one photo over another. The photo of Defendant Mendez-Sierra shows a number on the Defendant's hand in the same manner as the hand position of the other twenty-seven

1   individuals.  The position of Defendant Mendez-Sierra is not materially different from the

2   other twenty-seven individuals.  There is no evidence that the agents posed this Defendant

3   differently from the other twenty-seven individuals or that his photograph suggested any role

4   in this offense.

5          Even if the Court were to find that the photo-line was impermissible suggestive, there

6   are no factors which would lead to the conclusion that the suggestive procedure gave rise to

7   a substantial likelihood of irreparable misidentification. "To determine whether an

8   identification procedure violates a defendant's due process rights, a court must consider

9   'whether under the 'totality of circumstances' the identification was reliable even though the

10  confrontation procedure was suggestive." *United States v. Drake*, 543 F.3d 1080, 1088 (9th

11  Cir. 2008).  In determining the reliability of an overly suggestive identification, "the factors

12  to be considered in evaluating the likelihood of misidentification include the opportunity of the

13  witness to view the criminal at the time of the crime, the witness' degree of attention, the

14  accuracy of the witness' prior description of the criminal, the level of certainty demonstrated

15  by the witness at the confrontation, and the length of time between the crime and the

16  confrontation." *Neil v. Biggers*, 409 U.S. 188,199-200 (1972).

17         In this case, the two material witnesses stated before any photographs were shown to

18  them that they could identify the driver or the guide.  No description was offered prior to the

19  photo identification by any agent, the identification took place with a short period of time after

20  apprehension, and the material witnesses explained in their recorded statements their

21  opportunity to view the individuals identified.  There are no facts in this case from which the

22  Court would conclude that the photo identification process has lead to "a substantial likelihood

23  of irreparable misidentification." *Simmons v. United States*, 390 U.S. at 384.  Defendants will

24  have a full and fair opportunity to explore any claim of misidentification at trial.

25         Defendant's motion#34-2 to suppress suggestive identification is denied.

26                                        **CONCLUSION**

27         IT IS HEREBY ORDERED that 1) the motion to dismiss the indictment on the grounds

28  that the Government released material witnesses with exculpatory evidence (Doc. # 23) filed

by Defendant Toga-Gomez is denied; and 2) the motion to suppress all evidence resulting from unlawful investigatory stop and suppress suggestive identification (Doc. #34) filed by Defendant Mendez-Sierra is denied.

DATED:  August 12, 2010

**WILLIAM Q. HAYES**
United States District Judge

10cr312 WQH